**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

THE UNITED STATES OF AMERICA, )
Plaintiff, )
)
vs. ) Case No.: CR-09-329 (FAB)
)
1 REYNALDO LANDRON-CLASS, )
Defendant. )

---

TRANSCRIPT OF PROCEEDINGS
JURY TRIAL PROCEEDINGS, DAILY COPY
HEARD BEFORE JUDGE FRANCISCO A. BESOSA
ON JUNE 2, 2010

---

**A P P E A R A N C E S**

For the United States:
SCOTT ANDERSON
Assistant U.S. District Attorney
Torre Chardon, Suite 1201
350 Carlos Chardon Street
Hato Rey, Puerto Rico 00918

For the Defendant:
RAFAEL CASTRO-LANG
Attorney at Law
P. O. Box 9023222
San Juan, Puerto Rico 00902

---

**ROLAYNE M. VOLPE, CCR, RPR**
**Court Reporter for the U.S. District Court of Puerto Rico**
**Federal Building, Room 150**
**San Juan, Puerto Rico 00918**
**(787) 772-3482**

## I N D E X


| DESCRIPTION | PAGE |
|---|---|
| INDEX/EXHIBIT LIST | 2 |
| PROCEEDINGS | 3 |
| EXAMINATION OF DR. JOSE VAZQUEZ-SENTI: | |
| DIRECT EXAMINATION BY MR. ANDERSON | 5 |
| CROSS-EXAMINATION BY MR. CASTRO-LANG | 69 |
| REPORTER'S CERTIFICATE | 91 |


## E X H I B I T S


| DESCRIPTION | PAGE |
|---|---|
| Government's Exhibit No. 4 Telephone recordings | 11 |
| Government's Exhibit No. 4-A Transcript of Exhibit No. 4 Recordings | 13 |
| Government's Exhibit No. 7-A through 7-E Documents | 24 |
| Government's Exhibit No. 8-A Documents | 55 |
| Government's Exhibit No. 8-B Documents | 59 |
| Government's Exhibit No. 8-C Documents | 61 |
| Government's Exhibit No. 8-D through 8-M Documents | 63 |

The above-styled cause came on for hearing on the 2nd day of June, 2010, at 10:30 a.m., before Judge Francisco A. Besosa, Judge in the United States District Court for the District of Puerto Rico, when the following proceedings were had and entered of record, to wit:

**PROCEEDINGS**

**JURY TRIAL, DAY TWO**

(Dr. Vazquez is seated in the jury box.)

THE COURT: Good morning. Please be seated.

MR. CASTRO-LANG: Your Honor, very briefly, before the Jury comes in --

THE COURT: Of course.

MR. CASTRO-LANG: -- we would request from the Court, possibly, we would like the daily transcript from yesterday's testimony from Mr. Rosado.

THE COURT: There's a procedure for that. Please deal with --

MR. CASTRO-LANG: Since it's a CJA, though, I need authorization from the Court. That's the only reason why I'm requesting it from --

THE COURT: Yeah, but I think you have to fill out the form.

MR. CASTRO-LANG: I have no problem with that --

THE COURT: There's no problem with getting a daily.

MR. CASTRO-LANG: -- and with Vazquez-Senti.

THE COURT: All right. Fine.

All right. Bring the jury in, please.

(The jury is escorted into the courtroom at 10:31 a.m.)

THE COURT: Good morning, ladies and gentlemen. Please be seated.

All right. This morning we will continue with the Government's presentation of its case.

Mr. Anderson, you may proceed.

MR. ANDERSON: Yes, your Honor. The Government calls Jose Vazquez-Senti.

THE COURT: Please take Dr. Vazquez' oath.

THE COURTROOM DEPUTY CLERK: Yes, your Honor.

(The oath is administered by the Courtroom Deputy Clerk, and the witness answers as follows:)

THE WITNESS: I do.

THE COURTROOM DEPUTY CLERK: So help you God. Please be seated.

THE COURT: Mr. Anderson, go ahead.

MR. ANDERSON: Thank you, sir.

**DR. JOSE VAZQUEZ-SENTI**,

having been first duly sworn by the Courtroom Deputy Clerk of the Court to tell the truth, the whole truth, and nothing but the truth, was examined and testified upon his oath as follows:

**DIRECT EXAMINATION**

**By MR. ANDERSON**:

Q Can you please state your full name for the record.
A Jose Victor Luis Vazquez-Senti.
Q Sir, where are you presently living?
A At -- where I'm living at this time? MDC Guaynabo.
Q Why are you at MDC Guaynabo?
A Because I pled guilty to a conspiracy to distribute medication.
Q And MDC Guaynabo, that, of course, is a federal prison; correct?
A Yes, sir.
Q And approximately how long have you now been at MDC Guaynabo?
A Thirty-one months.
Q And you had stated that you were there because you pled guilty to the conspiracy to distribute what?
A Endocet and Alprazolam.
Q What is the active ingredient in Endocet?
A Oxycodone.
Q And do you know what schedule Oxycodone is?
A It's a controlled II.
Q Okay. When you pled guilty -- Well, withdrawn.
You're testifying here today under a cooperation agreement; correct?

A Yes, sir.
Q And with your plea and cooperation agreement, do you have any idea, as you sit here today, what your sentence is going to be?
A Whichever the Judge determines.
Q Okay. And under the statute for which you pled guilty, how much time are you facing? What's the maximum amount of time you can go to jail?
A Twenty years.
Q And, again, who makes the determination how much time you spend in jail?
A The Judge.
Q Has anyone from the United States Attorney's office made you any promises as to the sentence you will receive in this case?
A No, sir.
Q Has anyone from the Drug Enforcement Administration made you any promises as to the sentence?
A No, sir.
Q Has the Judge made you any promises as to what sentence you're going to get?
A No, sir.
Q Now, you said you pled guilty to conspiring to possess with intent to distribute controlled substances. Do you have any idea how many prescriptions you wrote during the course of your

conspiracy?
A Many. Probably over 10,000.
Q Do you know -- Withdrawn.
Of those prescriptions that you wrote, were the prescriptions for -- were the prescriptions medically necessary?
MR. CASTRO-LANG: Objection. Leading, your Honor.
THE COURT: Rephrase the question.
Q (By Mr. Anderson) What was the purpose of writing all those prescriptions?
A The purpose of prescribing them, you mean?
Q Why did you write all those -- You said you wrote over 10,000 prescriptions and you pled guilty to a conspiracy. Why did you write those prescriptions? For what purpose?
A Well, probably, I let myself get involved.
Q Did you make any money?
A Yes, sir.
Q How much did you charge per prescription?
A Seven dollars.
Q Do you know Reynaldo Landron-Class?
A Yes, sir.
Q Do you see him in court today?
A Yes, sir.
Q Could you please point to him and describe what he is wearing.

A The gentleman here with the light blue shirt.

MR. ANDERSON: Indicating the Defendant, your Honor.

Q (By Mr. Anderson) Did you ever write prescriptions for the Defendant?

A Yes, sir.

Q Do you have any idea how many prescriptions you wrote for the Defendant?

A No, sir, I don't recall.

Q Did the Defendant come to you as a treating physician, or were you just writing the prescriptions that he wanted?

A Well, in the beginning he would come as a patient.

Q And for how long did that last?

A Six, seven months.

Q And when did you first -- When do you remember first seeing the Defendant?

A I remember it was 2004, at the end of it, but I can't tell you precisely the date.

Q Okay. So at the end of 2004, you first start seeing him as a patient; correct?

A Yes, sir.

Q Okay. And you only saw him as a patient for -- you said about six months; correct?

A Yes, sir.

Q When the Defendant was no longer your patient, did you continue to sell him prescriptions?

MR. CASTRO-LANG: Objection, your Honor. It hasn't been established he quit seeing him as a patient.

MR. ANDERSON: He said for six or seven months.

THE COURT: Overruled.

Q (By Mr. Anderson) You can answer.

A Yes, sir.

Q And how much did you charge the Defendant when you sold him prescriptions?

A Seven dollars, sir.

Q Now, have you ever spoken with the Defendant on the telephone?

A Yes, sir.

Q How many times have you spoken to the Defendant -- with the Defendant on the phone; do you recall?

A Many.

Q More than ten?

A Yes, sir.

MR. ANDERSON: Your Honor, may I approach the witness?

THE COURT: Of course.

(Document shown to Mr. Castro by Mr. Anderson.)

Q (By Mr. Anderson) Doctor, could you please take a look at Government's Exhibit No. 4. You can take it out of that packet if you need to.

A Thank you.

Q Do you know what that is, sir?

A Yes, these are telephone calls recordings.
Q And who are they of telephone call recordings of?
A Reynaldo and myself.
Q And by Reynaldo, you mean the Defendant?
A Yes, sir.
Q When is the last time you listened to that CD you're holding in your hand, Government's Exhibit No. 4?
A May 24.
Q And how do you know that?
A Because I signed it here.
Q So your initials are on that document Number 4?
A Yes, sir.
Q And all the phone calls or all the recordings you listened to that's contained in Government's Exhibit No. 4, you recognize the voices in those phone calls?
A Yes, sir.
Q And, again, whose voices are contained in Government's Exhibit No. 4?
A Mr. Class's and mine.
Q Again, the Defendant and yourself; correct?
A Yes.
MR. ANDERSON: Your Honor, offered into evidence as Government's Exhibit No. 4.
THE COURT: Any objection?
MR. CASTRO-LANG: No objection, your Honor.

THE COURT: Admitted as Exhibit No. 4.

MR. ANDERSON: May I approach the witness, your Honor?

THE COURT: Yes, of course.

(Telephone recordings marked and admitted as Government's Exhibit No. 4.)

MR. ANDERSON: Permission to publish this to the jury?

THE COURT: Go ahead.

Q (By Mr. Anderson) Now, sir -- give us a couple of minutes to get this set up.

MR. ANDERSON: Your Honor, to go along with this, I have marked as Government's Exhibit No. 4-A, the transcripts, if I could submit to the Court for evidence, and I have copies for all the jurors and the defense counsel.

THE COURT: Do you have any objection to the transcript, Mr. --

MR. CASTRO-LANG: No, your Honor, but I would like to be able -- for purposes of identifying in my file, that I be able to see which one is A --

THE COURT: Of course. I thought Mr. Anderson said he had a copy for you. Do you?

MR. ANDERSON: Yes.

MR. CASTRO-LANG: Oh, I've been given a copy. I just need to see the identification.

THE COURT: You want it admitted as Exhibit 4-A, Mr. Anderson?

MR. ANDERSON: I'm sorry, your Honor?

THE COURT: Do you want it admitted as Exhibit 4-A?

MR. ANDERSON: 4-A, yes, to go with it.

THE COURT: Do you have any objection, Mr. Castro?

MR. CASTRO-LANG: If I can examine it?

THE COURT: Of course. Of course.

(Respite.)

MR. CASTRO-LANG: Your Honor, I noticed that there are multiple transcripts, and the folder is only identified as 4-A. And I would like to know if counsel intends to have each call with a separate letter for purposes of being able to use in the future? I think it would be confusing --

THE COURT: Well, let me ask this: Are the pages marked?

MR. ANDERSON: Yes. And the call numbers on the transcripts match the call numbers in the file.

THE COURT: I think that we can admit it as one exhibit because it -- according to Mr. Anderson, it corresponds to Exhibit 4.

MR. CASTRO-LANG: But there are numerous calls, your Honor.

THE COURT: Yeah, I know. But if you want to make a particular -- if you want to go to a particular call, I think there's a way by page number and call that you can identify it, so we'll admit it as Exhibit 4-A, the transcript.

Do you have copies for the jury?

MR. ANDERSON: I do. Mr. Castro has --

THE COURT: Of course.

MR. ANDERSON: We can pass these out --

THE COURT: Well, let's see what Mr. Castro says.

(Respite.)

MR. CASTRO-LANG: Yes, sir, I've verified the document. No objection.

THE COURT: All right.

(Transcript of Exhibit 4 recordings are marked and admitted as Government's Exhibit Number 4-A.)

MR. ANDERSON: Your Honor, at this time do we have permission to pass out the transcripts to the jury?

THE COURT: Go ahead.

MR. ANDERSON: Record should reflect I'm also providing one to defense counsel and to the witness.

Q (By Mr. Anderson) Okay. Doctor, I want to play for you the first phone call, Number 306, in the transcript. Listen to this phone call, sir. I'm going to ask you some questions when it's over.

(The audio is played.)

Q Now, Doctor, who in this recording is asking the name of the pharmacist?

A Reynaldo Landron.

Q And who is Lillian Poventud?

A She was the pharmacist taking care of the pharmacy as you arrived into Cidra. Gabriella is the name of the pharmacy.
Q Now, do you know why Defendant's calling and asking you the name of the pharmacist?
A Apparently, there was another person at the pharmacy.
Q Well, so what? Why is that important?
A Well, the relationship was with Pharmacist Poventud and not with the other pharmacist.
Q Okay. Let's go to the next call. Should be call 307.
(The audio is played.)
Q Now, in this phone call, who is saying, "I'm missing one"?
A Reynaldo is.
Q And when he says, "I'm missing one," what is he talking about?
A He was missing a prescription.
Q And in whose name was that prescription supposed to be written in?
A Ivan Crespo-Hernandez.
Q Is Ivan Crespo-Hernandez a legitimate patient of yours?
A No, sir.
Q And in the end, where he says, "I'm turning back to get it," what does that mean?
A That wherever he was, he would turn back to be able to pick it up.
Q And did you, in fact, ever provide prescriptions to the

Defendant in the name of Ivan Crespo-Hernandez?
A Well, I would imagine so, even though I cannot tell you precisely.
Q Okay. Let's go to the next call, 906. I may have to stop during this call to ask questions, so bear with me.
(The audio is played.)
Q Okay. I want to stop there for a moment.
In that phone call, we just heard Reynaldo say to you, "He told me that -- that, yes, that to work on Monday we can work but with ease. That's what we'll do." What is he talking about?
A To once again do the prescription for the pharmacy.
Q Okay. And later on, when he says, "You know, 20, so that if I do them by Monday, we'll get to -- three for Monday, at five for Thursday, like that, kind of mix it up, to run a week for 20 sheets." What is 20 sheets? What does he mean?
A Twenty prescriptions.
Q Okay. So in this part of the phone call, what are you talking about with the Defendant?
A Until the recording went all the way, until when it stopped?
Q Yes. So far what have we been talking about with the Defendant?
A We're talking about the way the 20 weekly prescriptions will be done.

Q Okay. Let's continue with the call.

(The audio is played.)

Q What are you talking about with the Defendant in that phone call?

A We kept on talking as to the manner of distributing the 20 weekly prescriptions.

Q And what kind of prescriptions are we talking about?

A Endocet.

Q And are these prescriptions that you and the Defendant are talking about, are they for legitimate medical conditions?

A No, sir.

Q Now, in the beginning of the call, a little at the beginning, he talks about -- or you say, "Remember that I did list two, the one that he's got -- the one that he's supposed to get; remember."

That's screwed up, but. . .

A Yes, sir.

Q And then you talk about, "And the list three." Remember hearing that?

A Yes, sir.

Q What are you talking about when you're talking about lists with the Defendant?

A A list of names and addresses.

Q And where did that list of names and addresses come from?

A Mr. Landron gave it to me.

MR. ANDERSON: Exhibit 7?

THE COURTROOM DEPUTY CLERK: Yes.

MR. ANDERSON: I have just marked these five documents, 7-A through 7-E. I'm showing to defense counsel.

(Respite.)

MR. CASTRO-LANG: Your Honor, may we approach?

THE COURT: Of course.

(Side-bar.)

MR. CASTRO-LANG: Your Honor, I'm concerned there are a series of annotations that appear to be additions not part of the original document. For example, here we have some dates, then we have marks.

MR. ANDERSON: Marks all made by the witness. He can explain what they are.

THE COURT: Okay.

MR. CASTRO-LANG: There's no -- there's a series and then we have stars, stars, stars,

THE COURT: All right. Okay.

MR. CASTRO-LANG: So it appears to have been altered. And that in that respect, your Honor, we have no -- I have a problem with the admission of documents that have been altered.

THE COURT: Well, they haven't been offered into evidence yet. So I would imagine that you're going to show them to the witness?

MR. ANDERSON: Yes, but unless defense counsel's

alleging that they have been altered after they were seized from the doctor --

MR. CASTRO-LANG: They appeared to be altered.

MR. ANDERSON: These lists, what I'm showing the witness now, the list defense counsel was provided in discovery, these alterations -- the witness can explain where the dates come from. He put them on the list -- all prior to the federal government seizing it. So these are the conditions when -- they were when we seized them.

THE COURT: All right. Well, I can -- I would imagine that you will go into that --

MR. ANDERSON: Uh-huh.

THE COURT: -- when provided to him, so your objection is a bit premature, Mr. Castro.

MR. CASTRO-LANG: Okay.

(End of side-bar.)

MR. ANDERSON: Your Honor, permission to approach the witness?

THE COURT: Of course. Go ahead.

Q (By Mr. Anderson) All right, sir. You were just testifying about lists. We heard "list" in the phone calls; correct?

A Yes.

Q Please take a look at 7-A, -B, -C, -D and -E for identification.

(Document is handed to the witness.)
Q Do you recognize Government's 7-A through 7-E?
A Yes, sir.
Q What are they?
A They're lists which were mentioned in the telephone call.
Q And who provided you 7-A, -B, -C, -D and -E?
A Mr. Landron did.
Q Do you remember approximately when he provided you 7-A through 7-E?
A It was in December, 2006.
Q How do you know that?
A Because on the upper part of some of the documents, there appears the date in which some of the documents were used.
Q Some of them were what? I'm sorry?
A Some of the documents were used.
Q Okay. On 7-A through -E, on some of those documents, you see dates written in; correct?
A Yes, several dates.
Q Who wrote those dates on 7-A through -E?
A I did.
Q What was the purpose of you writing those dates on that list?
A To know when was it prescribed the previous time.
Q Why is it important to keep track of when you're prescribing and for whom?

A Because the controlled substances have different -- certain amount of dates in which the prescription is to last. Depending on the number of medication, in this case, pills, is when you could repeat the prescription.
Q Okay. So for Oxycodone, if you try to fill a prescription before it's time, what happens?
A That medication would not be dispatched.
Q Aside from the dates that you put on those lists, did you make any other alterations to those notes?
A On 7-C, I wrote, on the last page, an additional name, Carmen, and then I added two other names.
Q Why did you add those names to that list?
A I don't recall, sir.
Q Who gave you the names to add to those lists?
A I don't recall.
Q Okay. Any other alterations?
A I'm going over them now.
Q Okay.
A On the last page of 7-E, I also wrote a mathematical equation.
Q Okay. Aside from those alterations that you made in 7-A through 7-E in substantially similar condition to when the Defendant gave it to you?
A Yes, sir.
MR. ANDERSON: Your Honor, offer them into evidence as

7-A through 7-E.
THE COURT: Any objection, Mr. Castro?
MR. CASTRO-LANG: Your Honor, can we *voir dire*?
THE COURT: Yes, of course.

*VOIR DIRE*

**BY MR. CASTRO-LANG:**

Q Good morning, ladies and gentlemen of the jury, your Honor, brother counsel. Good morning, Mr. Vazquez-Senti.
A Good morning.
Q Now, Mr. Vazquez, these -- aside from that one portion -- small portion that you said that you wrote in a name, is -- are those in your handwriting?
A My handwriting, no, sir.
Q None of those documents --
A Well --
Q The one that has the two little names?
A Only the ones that I pointed out.
Q None of the rest is written by you?
A No, sir.
Q Do you recognize whose handwriting is there?
A If I --
Q In whose handwriting? Whose handwriting is that? Do you know whose handwriting it is?
A It seems to me that it belongs to the former mate of Reynaldo or --

Q Appears. But you can't be certain?
A No, I didn't see when it was written.
Q Okay. Now, is there anywhere in the document -- in those documents where it says, Lists for Reynaldo Landron-Class?
A That it belongs to him?
Q is there anywhere in those documents where it says, Lists for Reynaldo Landron-Class?
A No, sir.
Q Now, was this document -- how -- where were these documents kept?
A At home.
Q Do you recall where?
A When?
Q Do you recall where?
A Since December, 2006.
Q No. Where? Where? Do you recall where the lists were?
THE COURT: Where in your house?
THE WITNESS: A piece of furniture in my home.
Q (By Mr. Castro-Lang) And how many other lists did you have there?
A I had the list of another person.
Q Uh-huh. And in total, about how many different lists of people that would give you names would you possess?
A Two.
Q And there weren't other people?

A There were other people, but I didn't have any lists delivered from them.
Q But you would receive names from other people for you to write prescriptions; is that correct?
A Yes, sir.
THE COURT: Mr. Castro, I think this question is best for Cross-Examination.
MR. CASTRO-LANG: Yes, your Honor. I agree.
Q (By Mr. Castro-Lang) Now, let me ask you, when -- at the moment you -- this list was brought to you, were you in prison?
A No, sir.
Q Okay. When was this brought to you for you to identify by agents of the prosecution?
MR. ANDERSON: Objection, assuming facts not in evidence.
THE COURT: Sustained.
MR. CASTRO-LANG: Well, your Honor, I'll reserve my right for Cross.
THE COURT: Of course. You always have a right to Cross-Examination.
You may proceed, Mr. Anderson.
MR. ANDERSON: Again, Government moves to enter these into evidence as 7-A through 7-E.
THE COURT: Any objection, Mr. Castro?
MR. CASTRO-LANG: Well, your Honor, we object as to

inadequate foundation.

THE COURT: Overruled.

Admitted as Exhibits 7-A and 7-E -- 7-A through 7-E.

MR. ANDERSON: May I approach the witness, your Honor?

THE COURT: Yes.

(Documents are marked and admitted as Government's Exhibit No. 7-A through 7-E.)

MR. ANDERSON: Permission to publish to the jury?

THE COURT: Go ahead.

Q (By Mr. Anderson) Can you see that?

A Yes, sir.

Q What's the first name on that list?

A Enrique Landron-Class.

Q Do you know who that is?

A Rey's brother.

Q And who is this right here?

A Reynaldo Landron-Class, the gentleman here.

Q And who is this first person up here? Can you read that name?

THE COURT: Bring it down a little bit. You can't see the name.

THE WITNESS: Was Reynaldo's former wife.

Q (By Mr. Anderson) This right here? Gladys Nieves-Melendez?

A Yes, sir.

Q And who is this person here; Number 17 on the list?
A A person who was at the office with Reynaldo once or twice.
Q I want to show you Government's Exhibit 7-D in evidence.
THE COURT: Mr. Anderson, would you please -- what was the previous exhibit?
MR. ANDERSON: Oh, the one I was showing on the Elmo was 7-A.
THE COURT: 7-A, okay. Thank you.
MR. ANDERSON: I'm now going to show you 7-D in evidence, if I can get it to focus.
THE COURT: All right. This is -- this is exhibit what?
MR. ANDERSON: 5-D in evidence.
THE COURT: Okay.
Q (By Mr. Anderson) Do you recognize that gentleman right there in the photograph?
A That's Hector.
Q Is that -- again, going back to 7-A -- now I'm too close -- is that Hector Santiago-Padilla?
A Yes, sir.
Q Okay.
(Respite.)
Q Okay. I want to show you 7-B. Whose name is that, right there?
A Rey's mate.

Q So Geomari Molina-Mendez, she's the Defendant's mate now?
A Well, I can't tell you whether they're still --
Q Okay. I'm sorry. That was his mate back during the time you were prescribing prescriptions to the Defendant?
A Yes, sir.
THE COURT: What's the number of that exhibit, Mr. Anderson?
MR. ANDERSON: That's 7-B.
THE COURT: 7-B as in "bravo"?
MR. ANDERSON: B as in "boy," yeah.
Q (By Mr. Anderson) Okay. So now we've heard the phone calls. The particular phone call we were listening to -- we just listened to was Number 906; correct?
A Yes, sir.
Q And in that call, the Defendant references -- or you and the Defendant talk about list two and list three; correct?
A Yes, sir.
Q Showing you Government's Exhibit 7-A again, what is that number in the right-hand corner?
A Two.
Q And showing you 7-E, what's that number in the top, right-hand corner?
A Three.
Q Are these the two lists that you are talking about in the telephone call we just heard?

A Yes, sir.
Q So when the Defendant -- you and the Defendant would talk about these lists, how would you utilize these lists, 7-A through 7-E?
A Well, I would -- I would use the names and the addresses to write down the prescriptions.
Q And under whose direction did you write prescriptions in the names of these people?
A Well, by an order in the list as they were used.
Q Yes, but who would tell you which list to use? Who would make that determination?
A Rey would.
Q And the prescriptions that you wrote pursuant to these lists, who did you give the prescriptions to?
A To Rey.
Q Okay. Let's go back to the phone call, now. A little later on -- a little later on in the phone call the Defendant is telling you how he goes to the pharmacy to pick them all up at once. Remember that part of the phone call?
A Yes, sir.
Q And you tell him, "It can get you in trouble." It's on Page 5 of the transcript. What do you mean, it could get him in trouble?
A In having all that medication together.
Q Okay. And then when you talk about -- a little further

down it says, "He will lead them there -- he will take them home." Who is he talking about? Who is "he"? Who will take what home?
A Mr. Dieppa.
Q And who is Mr. Dieppa?
A The owner of Gabriella Pharmacy.
Q By the way, sir, to digress, go back to your plea, you said you pled to a conspiracy to possess with intent to distribute controlled substances; remember that?
A Yes, sir.
Q Do you remember how many people were indicted with you?
A If I remember correctly, I think we were 23 of us.
Q Okay. So let's go back to the phone call here. I know I'm jumping around.
So we left off where you and the Defendant were talking about how Dieppa would take it home with him; right?
A Yes, sir.
Q A little while later, on Page 6, the Defendant tells you that: "He won't give me -- give me no labels." What does he mean when he says, "He won't give me no labels"?
MR. CASTRO-LANG: Objection as to "imagine."
THE COURT: Sustained.
Q (By Mr. Anderson) Okay. Let's back up a little bit. Right before that the Defendant tells you: "Remember that he won't give me with the seal. That comes out of the pharmacy in

only one bag. Nothing else. Nothing with it." And you indicated in that call that you understand what he's talking about. What is he talking about?

A Well, that the medication would be all put into one container.

Q And would there be labels on that container?

MR. CASTRO-LANG: Objection, lack of knowledge. No personal knowledge.

THE COURT: Excuse me?

MR. CASTRO-LANG: Lack of personal knowledge.

THE COURT: (No response.)

Q (By Mr. Anderson) Based upon the phone call that we heard?

A Based on the call, no, it wouldn't have any labels.

Q Okay. A little later on he talks -- Defendant, he says, on Page 8: "You see, let's do in the week to make it 20. Let's leave those 20. Let's push those 20. Then when I go by I can tell him I can bring something more or I -- I can't bring you. If he tells me, yes, well, I'll bring him 20 more."

What is being discussed in that portion of the call?

A We were talking about the 20 original prescriptions. We were talking about, and the possibility that it could be more than 20.

Q Okay. Now, down at the bottom of Page 8, in the phone call, the Defendant says to you: "Listen, you know what's going on, that when I go to work with you, I'll be stuck

because of the profits. I don't have too much demand for the other one."

What is the Defendant talking about in that passage?
A About Alprazolam.
Q Okay. And what about Alprazolam?
A Apparently, they were not moving so fast.
Q Okay. Let's go on to the next call, number 1248. Go ahead. We can play this call now.

(The audio is played.)

Q All right. Now, in that phone call, sir, in the beginning you're talking to the Defendant about someone's child; correct?
A Yes, sir.
Q Now -- Withdrawn.

Halfway through, you tell the Defendant -- you asked the Defendant if he needs anything for tomorrow?
A Yes, sir.
Q Because you're going to be working at the Veteran's -- Veteran's Hospital?
A Yes, sir.
Q Why did you tell the Defendant you were working at Veteran's?
A Because at some point in time I wanted some space; that I not only told him, I told many people.
Q What was the purpose of telling the Defendant and many people that you work at Veteran's?

A To have more free time for me.
Q Do you work at Veteran's?
A No, sir.
Q Did you ever work at Veteran's?
A No, sir.
Q The Defendant tells you that he's going over to Caugas. Do you know why he's going to Caugas?
A To the pharmacy.
Q What pharmacy is in Caugas that you are aware of, that the Defendant is talking about?
A Bonneville.
Q And he tells you that he was there late and she didn't work until two or three hours only on Saturday. And you're talking about her -- that she went to a convention. Who are you talking about?
A Pharmacist Perez.
Q And the Pharmacist Perez is from Pharmacy Bonneville?
A Pharmacist Perez is the owner of Bonneville Pharmacy, yes, sir.
Q Then the Defendant tells you he took advantage -- it was eight. He took advantage of four that was over there. What is he talking about?
A Of the eight prescriptions he was taking, she was only able to buy four.
Q Okay. Sir, how many times have you met with the Defendant?

Total?
A Many.
Q What's many? Can you give us an approximate number, if you could guess within reason?
A Well, it's very difficult because we would see each other quite often and also we'd talk about his family.
Q And when you met with the Defendant, was it always -- where did you meet the Defendant?
A Sometimes at the office; sometimes at my home.
Q Did you ever meet the Defendant anywhere besides your office or your home?
A Yes, at some fast-foods.
Q Every time you met the Defendant, did you provide him prescriptions?
MR. CASTRO-LANG: I object, that's leading.
THE COURT: Rephrase the question.
Q (By Mr. Anderson) When you met with the Defendant, what was the purpose of meeting him?
A Generally the prescriptions.
Q Did you ever meet with him and not give him prescriptions?
A Sometimes, yes.
Q Okay. All right. Let's go to the next call, 1976.
(The audio is played.)
Q Okay. In that phone call he says: "Can I come by?" You say: "Yes." He says he wants the 25 you'd told me you'd do

for me."

The 25 what?

A Twenty-five prescriptions.

Q And when he says: To put tomorrow's date, from then on, five by five, and then you discuss Monday, Tuesday, Wednesday, Thursday, and Friday.

A Yes, sir.

Q What do you mean when you're discussing five by five for Monday, Tuesday, Wednesday, Thursday, and Friday?

A Five daily prescriptions.

Q I'm sorry. Five?

A Daily prescriptions.

Q So in that call, are you agreeing to give the Defendant five prescriptions every day, Monday through Friday?

A Yes, sir.

Q And what does the five by five mean?

A Five per day.

Q Okay. Let's go to call 2877, the next one.

(The audio is played.)

Q Now, sir, in that phone call, the first thing we hear when you answer the phone is the Defendant telling you he was stopped by the police; correct?

A Yes, sir.

Q And which pharmacy is he talking about in this phone call?

A Carimas.

Q Carimas? That's the pharmacy in Levittown?
A Yes, sir.
Q And when he says, "They nabbed me there with the Geomari sheets"; what does he mean when he says, "the Geomari sheets"?
A With his prescriptions.
Q And showing you Government's Exhibit 7-B, when he's talking about the Geomari sheets, he's talking about this woman, Geomari Molina-Mendez, that's on the patient list he provided you?
A Yes, sir.
Q And then he says that they told the police that they found the sheets in Burger King?
A Yes, sir.
Q Then he goes on -- he tells you exactly -- the bottom of Page 2 to the top of Page 3 -- you're talking about the number of sheets, the number of prescriptions; correct?
A Yes, sir.
Q And he said it was nine sheets of doubles. What does that mean?
A Which were of Endocet and Alprazolam.
Q And he says that you --
THE COURT: I'm sorry, I didn't catch that. What was the answer?
THE WITNESS: Endocet and Alprazolam.
THE COURT: Okay.

Q (By Mr. Anderson) And then he tells you he's going to give you the names of the persons just in case they call you. Why? What does he want you to do if they call you?
A It's not that I had given them out. It was just they were on the prescription.
Q Okay. But he talks about if the authorities call you, and you said you'll just tell them they were your patients. Were the prescriptions that the Defendant's talking about being seized by the police from his wife, were they written for real patients?
A They were real persons but not real patients.
Q Okay. And then on Page 5, finally, he asked you whether you can do them for me again. What does he mean?
A If we were able to repeat those that they have nabbed.
Q So the ones that were seized, he wants you to replace them?
A Yes, sir.
Q Okay. Let's go to the next call, 2998.
(The audio is played.)
Q Now, sir, the very beginning of call you ask the Defendant: "Did you solve that thing?" What are you talking about?
A The intervention with the police the day before.
Q Okay. So in this call you're talking about whether or not the police contacted you; correct?
A Yes, sir.
Q And what are you and the Defendant discussing? What are

you and the Defendant going to do if the police start contacting you?
A Well, I was going to say that the persons were my patients and the person would say the same.
Q And then later in the phone call you agree to meet with the Defendant; correct?
A Yes, sir.
Q And what's the purpose of him coming to meet you again this day?
A Prescriptions.
Q Now, on Page 5, you tell the Defendant to come at 12:15 because that one is coming at 11:30. You already know who.
Who are you and the Defendant speaking about?
A Former wife.
Q Do you know the former wife's name?
A Gladys.
Q And showing you Government's Exhibit 7-A again, this name here on top of the Page, Number 8, Gladys Nieves-Melendez, is that who you are talking about in this phone call?
A Yes, sir.
Q And why don't you want Gladys Nieves-Melendez to be there when the Defendant shows up?
A Well, because the Defendant already had a new mate, and I didn't want any problems between them.
Q And the new mate that you are of concern that Gladys

Nieves-Melendez would have problems with is who?
A Geomari.
Q I'm sorry?
A Geomari.
Q Let's go to the next call, 3028.
(The audio is played.)
Q Okay. Now, in that call, the Defendant is informing you that, "Kathy was just stopped now." Who is Kathy?
A Gladys. That's Gladys's nickname.
Q Okay. So the same Gladys Nieves-Melendez, who's on the Defendant's patient list, that he used to be married to, that's Kathy?
A Yes, sir.
Q And he's told you that Kathy tore the sheets. What does that mean?
A That Kathy had torn the prescriptions.
Q And you tell him, "Don't come over." And he says: "He'll be faking it only, but I won't go in." What does that mean?
A Well, I was living in a controlled access development, and I told him not to come by. And he said he was faking it, and he was just going for a drive.
Q Okay. He actually tells you, "I'll be faking it only to see if they stop me again"; correct?
A Yes, sir.
Q And when he says, "To see if they stop me," who is he

referring to when he uses the term "they"?
MR. CASTRO-LANG: Objection, your Honor, as to "imagine."
THE COURT: Sustained.
Q (By Mr. Anderson) Do you know who he's speaking about when he says: "To see if they will stop me again"?
A Well, the day before he had been stopped by the police, and that day Kathy was stopped.
Q Let's go to the final call, 3033. Listen to it in its entirety, then I'll ask you a question.
(The audio is played.)
Q Now, sir, in this phone call, again, we start off with the Defendants advising you or informing you of who's being stopped; correct?
A Yes, sir.
Q And almost halfway through the recording, on Page 4, he tells you -- he reaffirms the fact that he was stopped in Levittown the day before; correct?
A Levittown, yes, sir.
Q And then on the next page, you talk about -- you talk to the Defendant about what can be done; correct?
A Yes, sir.
Q And then at this point you decide to switch to a different telephone; correct?
A Yes, sir.

Q Why? Why did you want him to call you at the other telephone number?
A Because I had the suspicious -- suspicions that this -- that the telephone had been bugged.
Q And what gave you that suspicion?
A Well, my telephone had double line and on some occasions they appeared both to be busy.
Q Okay. A little further down the call, after you give him the number, you start talking about meeting. Why are you talking about meeting first at the Walgreens in Plaza Carolina?
A In order to avoid the rounds we were hit with.
Q But why -- what are you trying to avoid? Why?
A In order to be able to deliver the prescriptions.
Q Okay. So when the Defendant -- now, when you tell the Defendant, "I'll be taking you the thing. There is in an envelope. I'll give you the envelope and that's it," what are you talking about?
A The prescriptions.
Q And then you finally agree to meet at Burger King at Plaza Las Americas; is that correct?
A Yes, sir.
Q And toward the end of the call he says: "I'll give you the names." What does he mean, "I'll give you the names"?
A The names on the prescriptions.
Q But I thought you testified earlier that the prescriptions

you wrote for the Defendant were from these patient lists, 7-A through -E.

A Those lists were only used for Gabriella.

MR. ANDERSON: Your Honor, this might be a correct time -- or a good time to break and continue in the afternoon with the witness.

THE COURT: Are you through with these -- with the --

MR. ANDERSON: With the phone calls, I am. This is a good transition point, yeah.

THE COURT: Okay. All right. Let's take our lunch break. It's 12 o'clock. Please be back at 1:15.

COURT SECURITY OFFICER: All rise.

(The jury is escorted from the courtroom at 12:03 p.m.)

(A lunch break is taken from 12:03 p.m. until 1:35 p.m; at which time, the proceedings continue as follows:)

THE COURT: Please be seated.

Bring the jury in.

(The jury is escorted into the courtroom at 1:36 p.m.)

THE COURT: Good afternoon. Please be seated.

Mr. Anderson, you may proceed.

MR. ANDERSON: Thank you.

Q (By Mr. Anderson) Doctor, prior to lunch, we had left off your testimony with the last telephone call we heard where you're planning to meet the Defendant at Burger King. Remember

that phone call we played before lunch?
A Yes, sir.
Q Okay. I want to show you what we're going to introduce into evidence as Government's Exhibit No. 6.
The monitors.
Now, there's no sound.
(The video is played.)
Q Okay. What are we looking at here? Where is this?
A The rear side of Sears store at Plaza Las America.
Q Okay. Is this where the Burger King is located?
A Yes, sir.
MR. ANDERSON: Now, if there's no objection, your Honor, I can fast forward to the point I'm trying to get to.
THE COURT: Any objection?
MR. CASTRO-LANG: No, objection, your Honor.
(Respite.)
(The video is played.)
Q (By Mr. Anderson) I wanted to ask you, who -- the bottom left-hand corner of the screen, who is that gentleman seated right there?
A That's me.
(The video is played.)
Q And, again, that gentleman in the bottom part of your screen?
A The one on the left is me.

(The video is played.)
Q Now, who is that gentleman who just walked in on the left-hand part of the screen?
A Rey.
Q Why are you and the Defendant meeting at this Burger King?
A For the prescriptions.
Q Have you and the Defendant ever met at this Burger King before?
A No.
Q But I think you testified earlier that you've met him at other fast-food restaurants; correct?
MR. CASTRO-LANG: Objection, your Honor. Leading.
THE COURT: Well, I'll allow it.
THE DEFENDANT: Uh-huh. But not in this one.
Q (By Mr. Anderson) Okay. Keep watching the video.
(The video is played.)
Q Do you know who that second gentleman is that just walked in?
A I don't recall who he is.
Q Okay. Now, I want to go back to the phone call -- the last phone call that we heard when you're talking to the Defendant and meeting at the Burger King. Is this where you are meeting to provide him as you stated: I'll be taking you the things there in an envelope?
MR. CASTRO-LANG: Objection. Totally leading, your

Honor.

MR. ANDERSON: This is his conversation in the Title III.

THE COURT: Overruled.

THE WITNESS: Yes, sir.

MR. ANDERSON: Continue.

(The video is played.)

Q (By Mr. Anderson) Now, can you see that gentleman who is leaving; do you see anything in his hands?

A Well, not clearly.

Q Okay.

(The video is played.)

Q So, Doctor, when you meet the Defendant like this, we just saw in Government's Exhibit No. 6, how do you give him the prescriptions?

MR. CASTRO-LANG: Objection, your Honor. The video speaks for itself. And the video does not reflect any transfer of documents whatsoever. We object that the Government is trying to alter and change the video. It does not reflect --

MR. ANDERSON: I'll rephrase.

THE COURT: He'll rephrase the question.

Q (By Mr. Anderson) When you meet with the Defendant, any time --

You testified you met with him numerous times to provide prescriptions.

-- how would you provide the prescriptions to Defendant when you met him?

MR. CASTRO-LANG: Objection as to "anytime," your Honor. We don't know what event he's speaking about.

THE COURT: Overruled.

THE WITNESS: Well, generally, I would deliver them in an envelope.

Q (By Mr. Anderson) Now, you had testified earlier that you received these lists from the Defendant, and I believe it was December of 2006; correct?

A Yes, sir.

Q And you also testified earlier that you started seeing the Defendant as a patient in late 2004; correct?

A Yes, sir.

Q And he was your patient for about six to seven months; correct?

A Approximately.

Q From the time the Defendant stopped being your patient to the time Defendant provided you with these patient lists, did you ever provide the Defendant prescriptions?

A Yes, sir.

Q How did you get the names for those prescriptions if he hadn't given you the lists yet?

A He would dictate them to me.

Q Okay. Doctor, I want to hand you 8 -- First, I want to

hand you what I have marked as Government's Exhibit 8-A.

Record reflect that I'm showing defense counsel.

(Respite.)

MR. ANDERSON: May I approach the witness, your Honor?

THE COURT: Do you have any objection to the exhibit, Mr. Castro?

MR. CASTRO-LANG: Yes. Until it's authenticated, for sure.

Q (By Mr. Anderson) Doctor, please take a look at document 8-A for identification. Do you recognize that?

A Yes, sir.

Q Okay. When is the last time that you looked at Government's Exhibit 8-A?

A May 24th.

Q And how do you know that -- May 24th of what year?

A 2010.

Q How do you know that?

A The date and my initials are here.

Q What is 8-A for identification?

A This is a series of prescriptions issued by me.

Q Okay. And back on the 24th of May, you looked at every one of those prescriptions; correct?

A Yes, sir.

Q And what are those prescriptions for?

A Well, they are made out in different names.

Q I'm sorry, what controlled substance are those -- all those prescriptions written for?
A Endocet.
Q And were any of those people contained in 8-A, were they real patients of yours?
A At some point in time they were, but not by that time.
Q Not by the time -- the date of those prescriptions; correct?
A Correct.
MR. ANDERSON: Offer them into evidence, your Honor.
THE COURT: Any objection, Mr. Castro?
MR. CASTRO-LANG: Excuse me, your Honor, may I *voir dire*?
THE COURT: Of course.

*VOIR DIRE*

**BY MR. CASTRO-LANG:**

Q Good afternoon, ladies and gentlemen of the jury, your Honor, Mr. Vazquez-Senti. Those prescriptions, sir, were not taken from your office; isn't that so?
A No.
Q In fact, they appear to have been presented in some pharmacy; correct?
A Yes, sir, they were presented at some pharmacy, and they were dispatched, as well.
Q Are you a -- Did you work at those pharmacies?

A No, sir.

Q Do you know how they conduct the regularly -- keep their records regularly at the particular pharmacy?

A No, sir.

Q Do you know when a person comes and presents, like a controlled substance like Endocet, Controlled Substance II, and present it to the pharmacist, do you know what the pharmacist is supposed to do at the moment the person gives the prescription to them?

A Generally ask for an identification.

Q And they have to sign it also in the back, the person that presents it; right?

A Yes, sir.

Q So when you present a -- a person comes with a prescription drug like this, the pharmacist -- the pharmacist requires a identification, takes it, places that on the back, and that person signs it; is that correct?

MR. ANDERSON: Objection, your Honor. This is outside the scope of *voir dire*.

MR. CASTRO-LANG: No.

MR. ANDERSON: This is Cross-Examination.

THE COURT: Hold on.

(Respite.)

THE COURT: Sustained.

Q (By Mr. Castro-Lang) Now, so you --

THE COURT: Just stick to the *voir dire* questions. If you have any questions during Cross-Examination, you will be able to do that.

MR. CASTRO-LANG: With all due respect, your Honor, these are not prescriptions from his office. These are prescriptions that were obtained in the pharmacy.

MR. ANDERSON: Can we not have legal argument in front of the jury.

THE COURT: That's correct. So just -- What I'm telling you, stick to the *voir dire*. Go ahead, Mr. Castro.

Q (By Mr. Castro-Lang) So you cannot state at all how these prescriptions were maintained in the regular course of business at the particular pharmacy where they were changed; isn't that so?

A No, sir.

MR. CASTRO-LANG: I object. Insufficient foundation.

MR. ANDERSON: Your Honor, can I ask two more questions?

THE COURT: Yes, of course.

Q (By Mr. Anderson) As a Doctor -- Government Exhibit 8-A -- is that how you prescribe medication?

A Could you please repeat the question.

Q As a doctor -- As a doctor, how do you provide a patient with medication?

A Through a prescription.

Q Prescription like the ones you're looking at in Government's Exhibit 8-A?
A Yes, sir.
Q Are they the original prescriptions?
A Originals, yes.
Q And is your original -- They come from your original prescription pad; correct?
A Yes, sir.
Q And each one of them contains your signature; correct?
A Yes, sir.
Q Is there any other way for you to provide Schedule II controlled substances to a patient besides using a prescription that's contained in 8-A?
A No, sir.
MR. ANDERSON: Your Honor, I renew my offer.
MR. CASTRO-LANG: Your Honor, *voir dire*?

*VOIR DIRE*

**BY MR. CASTRO-LANG:**

Q None of these prescriptions were occupied in your office; isn't that so?
MR. ANDERSON: Objection. Asked and answered.
THE COURT: Sustained.
MR. CASTRO-LANG: May we approach, your Honor?
(Side-bar.)
MR. CASTRO-LANG: Your Honor, I find this foundation

insufficient. I think that at this time the Court should not allow them in evidence because, your Honor, these are prescriptions that were not occupied at the offices of Dr. Senti. They were seized by agents -- my understanding -- I haven't been given Jencks, your Honor, but my understanding is that they were seized by agents in a search warrant at different pharmacies. These are an -- this is -- these are business records of a pharmacy occupied at the pharmacy, where to examine the prescriptions, they are not in the same condition that when Mr. Vazquez-Senti wrote them out. When Mr. Vazquez-Senti wrote them out, all you had is a prescription with nothing more. These prescriptions contain other data in the back that they have been presented in another place, they have been changed in the sense that there's clearly annotations, there are stamps there, that do not pertain to Vazquez-Senti. It is impossible with just his testimony of Vazquez-Senti to permit these prescriptions in evidence when it is clear that they went out of -- out of his possession, somebody had to go to a pharmacy, the pharmacy had to deal with it, it's been completely changed. Rule -- the only way, to my understanding, your Honor, is that Rule 803 requires that. . .

(The Judge gets a book from the bench.)

MR. CASTRO-LANG: -- 806(c), record of regularly conducted activity. Obviously these are prescriptions that are

received in the regular conduction of the business of each pharmacy. And it says here that in order for them to be admitted into evidence, they have to be -- you have to have a -- testimony of the custodian, the qualified witness, to authenticate that this was, in fact, done in accordance with the regular conducted business.

He's not a custodian, your Honor. It's -- it's one thing if he had just come in with some prescriptions, but it's quite another thing for the Government to pretend that this Court admitted in evidence records that at the time they were seized, consisted of records of a business that this -- this witness had absolutely no relationship. He cannot testify about the reliability, your Honor. So the foundation is insufficient. He has to bring in -- if he -- if he wants to have them in evidence, he has to complete the authentication by bringing in a custodian, okay? Otherwise, they're inadmissible.

THE COURT: Mr. Anderson?

MR. ANDERSON: First of all, for the record, all Jencks has been turned over to defense counsel.

Wrong. This witness was the custodian of these prescriptions at the very beginning. They came from him. They're his original prescription pad. He wrote them. He signed them. It's -- this is not as though the pharmacy can come in and say, We keep these records independent of anyone

else. They have these records because they come from this witness. They don't have any independent knowledge -- They can come in and testify how they store them and how they keep them in file cabinets, but they cannot authenticate and talk about who originated these prescriptions. That's what this witness does who wrote them. Even whether or not slightly altered with the sticker, they were dispensed, is irrelevant. Because what we put on that document is still there, and it's clear; therefore, he is a custodian of these record. There's more than one custodian of these records.

Defense counsel is focusing on who they were seized from; I'm focusing on who they came from. This witness --

MR. CASTRO-LANG: Your Honor, with all due respect, the resolution are made out to the patients.

THE COURT: He wrote them.

MR. CASTRO-LANG: They're not his documents. He released these documents years ago. To someone. To someone. He released those documents to someone. Somebody went to a pharmacy and purportedly changed them --

THE COURT: You don't have to tell me -- If you write a letter to a -- a person and that person has the letter, that's the only person who can say that's your letter?

MR. CASTRO-LANG: Wait. Wait. But the problem is, is that this is more than just a written prescription. This is a prescription that was delivered to a pharmacy.

THE COURT: I'm making an analogy. Let's say I write a letter to you, and the -- seized it from your office, they sit me down on the witness stand, Is this your letter? Yeah, that's me.

MR. CASTRO-LANG: All right.

THE COURT: Isn't that the same here?

MR. CASTRO-LANG: No. No. With all due respect, my letter is not change. It's my letter. Here you've --

THE COURT: What if you -- what if you received it and you put a date stamp on it, received on such-and-such a date, and you initialed it?

MR. CASTRO-LANG: Your Honor, but these are prescriptions that -- there are requirements that have to be followed. And they're presenting the whole prescription in evidence.

THE COURT: Well, I --

MR. CASTRO-LANG: It's inadmissible with just his testimony.

THE COURT: No, I think that -- if I wrote you a letter, and your secretary receives it, stamps it, received on such-and-such date and initials it and they seize it from your office, sit me on the witness stand, and say: Is this your letter? Yes. You can't -- I don't think you can argue just because it's got a stamp on it from your office and your secretary can receive as to, that's my letter --

MR. CASTRO-LANG: You're forgetting there are third parties intervening here. It's not just a letter that you sent to my office. This is a prescription made out to a person, somebody took it to a pharmacy, that pharmacy then had to follow their regular business practice in accepting the prescription --

THE COURT: No, that's not the point here.

MR. CASTRO-LANG: -- then there's the way it is maintained in custody, your Honor.

THE COURT: That's not the point here. The point here is not --

MR. CASTRO-LANG: That is the point.

THE COURT: No.

MR. CASTRO-LANG: Trying to say that the prescriptions -- they want to put attributable criminal liability on my client on a prescription based conclusively on the fact that Vazquez-Senti recognizes that he executed the prescription --

THE COURT: Well, we don't. . . I don't know.

MR. CASTRO-LANG: Now, a document that is presented to a third party that he has admitted he has no relationship with, that he doesn't know -- doesn't know how they keep the records in business, and so, therefore, it's lacking. There's lacking --

THE COURT: He wrote it. He wrote it. The objection is overruled.

MR. ANDERSON: Thank you.
MR. CASTRO-LANG: Your Honor, I want the record clear.
THE COURT: It's very clear.
MR. CASTRO-LANG: That it's clear --
THE COURT: It's very clear. You made your record very clear.
MR. CASTRO-LANG: Okay. Okay.
(End of side-bar.)
MR. ANDERSON: Your Honor, I renew my offer.
THE COURT: Objection overruled. Admitted as exhibit.
Admitted as Exhibit 8-A.
(Documents are marked and admitted as Government's Exhibit 8-A.)
Q (By Mr. Anderson) Sir, now showing you what I'm marking as 8-B.
Showing to defense counsel.
(Respite.)
MR. CASTRO-LANG: Your Honor, may we approach?
THE COURT: Of course.
(Side-bar.)
MR. CASTRO-LANG: Again --
THE COURT: Do you have the same objection?
MR. CASTRO-LANG: Wait. It just keeps on getting complicated. These are annotations like that had -- informing where it came from. Okay? I object to this, number one.

Number one, I object to this.

THE COURT: That -- Okay. Can take that off?

MR. ANDERSON: Yes.

THE COURT: It's off.

MR. CASTRO-LANG: Number two, it's that, you see, your Honor, which is why I'm telling you there's a problem with the authentication. From -- from the prescription, you don't know what pharmacy it was changed. From the prescription, you don't know what pharmacy it was changed.

THE COURT: Well, he may be able to testify as to that, I don't know. But I don't think that's important as far as the prescription is concerned, if they are his prescriptions, at this point.

MR. ANDERSON: We have another witness to explain where they came from and where they were compiled. That's the next witness.

MR. CASTRO-LANG: That they are going to bring?

MR. ANDERSON: To say where these were seized from and how we compiled these exhibits, individual exhibits.

THE COURT: Okay.

MR. CASTRO-LANG: Well, again, I have an additional objection that --

THE COURT: Additional to the ones you did to 8-A?

MR. CASTRO-LANG: Additional to that.

THE COURT: Make sure for the record that the

objections that Mr. Castro made for what has been admitted as Exhibit 8-A are for this exhibit for identification.

MR. CASTRO-LANG: For all prescriptions.

THE COURT: For this exhibit for identification, 8-A, so he doesn't have to repeat.

MR. CASTRO-LANG: In addition to that, there's some identifications that the Government has placed at the bottom. For example, this "G" is Gabriella. This "C" is Carimas.

THE COURT: All right. Let's --

MR. CASTRO-LANG: This witness will not testify --

THE COURT: Is he going to testify as to those letters, G, C?

MR. ANDERSON: Not any questions about that.

THE COURT: That coming with the next witness?

MR. ANDERSON: Yeah, he can do it. The reason for this is that at the end of the trial, we have to put these back into their -- we seized 50-something thousand prescriptions. When we put these back in, the agents, those go to Gabriella. Otherwise, they have to sit down, go through 2,700 prescriptions all over again to find out where they properly go. It's just for our --

THE COURT: He's just going to testify --

MR. ANDERSON: I don't know if he knows why they're there. Didn't ask him and not asking him now.

THE COURT: Okay. Objection overruled.

(End of side-bar.)

MR. ANDERSON: Oh, actually, I haven't even shown these to the witness yet.

THE COURT: Please do.

Q (By Mr. Anderson) Sir, now showing you Government's Exhibit 8-B. Please take a look at that. Do you recognize that?

A Yes, sir.

Q What are they?

A Medical prescriptions.

Q And who wrote those prescriptions?

A I did.

Q And when is the last time you looked at those prescriptions?

A May 20th, 2010.

Q And were any of those -- any of the names on those prescriptions real patients?

A Not at the time of the prescription.

Q Okay. And, again, these are the original prescriptions; correct?

A Yes, sir.

MR. ANDERSON: Offer them into evidence, your Honor.

MR. CASTRO-LANG: Just one question, your Honor.

THE COURT: Of course.

*VOIR DIRE*

**BY MR. CASTRO-LANG**:
Q Dr. Vazquez, just from looking at the prescription alone, can you tell at what pharmacy it was changed?
A The pharmacy should be identified on the rear side. This one, for instance --
Well, I have visual problem. I lost the eyesight of my left eye.
-- they have a label attached by the pharmacy showing the day and the prescription number for --
Q Does the label mention the name of the pharmacy?
A No, sir.
Q I ask the question again: Do you know just from looking at the prescription at which pharmacy it was changed?
A No, sir.
MR. CASTRO-LANG: Thank you.
Objection, your Honor.
THE COURT: Objection overruled. Admitted as Exhibit 8-B.
MR. ANDERSON: Thank you.
(Documents are marked and admitted as Government's Exhibit 8-B.)
MR. ANDERSON: Let's go to 8-C.
Showing defense counsel.
MR. CASTRO-LANG: 18 or 8-C?
MR. ANDERSON: 8-C.

(Respite.)

MR. ANDERSON: Permission to approach the witness, your Honor?

THE COURT: Go ahead.

Q (By Mr. Anderson) Sir, I'm showing you Government's Exhibit 8-C. Again, take a look at that and tell me if you recognize that.

A Yes, sir.

Q And what do you recognize that to be, 8-C?

A Endocet medical prescriptions prepared by me.

Q And they're the original prescriptions?

A Yes, sir.

Q By the way, how many pills per prescription are we talking about in these prescriptions?

A Most of the cases they were 50.

Q Okay. Now, those people in 8-C, were any of those -- Well, when did you last look at all those prescriptions?

A May 20, 2010.

Q Are any of those people listed in 8-C legitimate real patients of yours?

A No, sir.

Q And your signature appears on all those prescriptions; correct?

A Yes, sir.

MR. ANDERSON: Offered into evidence, your Honor.

THE COURT: Any objection?
MR. CASTRO-LANG: Same objection, your Honor.
THE COURT: Overruled. Admitted as Exhibit 8-C.
(Documents are marked and admitted into evidence as Government's Exhibit 8-C.)
MR. ANDERSON: To speed things up, may I have permission to hand this entire box to the witness and we can go through them much quicker?
THE COURT: How much? What do you have there? Eight what?
MR. ANDERSON: Up to 8-M.
THE COURT: Up to 8-M?
MR. ANDERSON: We'll do it one by one, but I can leave it up there, and he can --.
THE COURT: All right. Okay.
MR. CASTRO-LANG: I would like to examine them before he gives them to the witness.
MR. ANDERSON: Absolutely.
Record reflect, I'm handing 8-D through 8-M to defense counsel.
(Respite.)
MR. CASTRO-LANG: Thank you, your Honor.
THE COURT: All right.
MR. ANDERSON: Permission to approach the witness, your Honor?

THE COURT: Go ahead.
Q (By Mr. Anderson) Sir, I'm handing you now Government's Exhibit 8-D through 8-M.
THE COURT: Exhibit for identification, right, Mr. --
MR. ANDERSON: Yes. Right. Thank you.
Q (By Mr. Anderson) I want you to take these out one by one and take a look at them. Starting with the first one here. Take a look at each one and let me know when you're done.
(Respite.)
A You want me to let you know each one of them, or all of them?
Q Just look at all of them right now. When you're done, let me know.
(Respite.)
Q Okay. Having just looked through Government's Exhibit 8-D through 8-M for identification, do you recognize all those documents?
A Yes, sir.
Q And what are they?
A Medical prescriptions.
Q And who wrote them?
A I did.
Q And for what controlled substance?
A Table II, Endocet.
Q And how many pills per prescription?

A Fifty.
Q And any of the -- When was the last time that you looked at Government's Exhibit 8-D through 8-M?
A May 20, 2010.
Q And how do you know that?
A Because I signed and initialed the folders.
Q So each folder has your initials and the date?
A Yes, sir.
Q And were any of those prescriptions written to a real patient?
A No, sir.
MR. ANDERSON: Offering into evidence, your Honor, as Government 8-D through 8-M.
MR. CASTRO-LANG: Same objections, your Honor.
THE COURT: Objection overruled. Admitted as exhibits 8-D through 8-M.
MR. ANDERSON: Permission to approach the witness, your Honor?
THE COURT: Yes.
(Documents are marked and admitted as Government's Exhibit 8-D through 8-M.)
MR. ANDERSON: Okay. Let's go to 8-A, that's already in evidence, so we can see what we're looking at.
Permission to publish to the jury, your Honor?
THE COURT: Of course.

MR. ANDERSON: Can I have the overhead, please.
Q (By Mr. Anderson) Let's take a look. I'm going to -- All right, Doctor, we're looking at what we have marked and entered as Government's Exhibit 8-A. What are we looking at here?
A This is a prescription.
Q Okay. And this is your original prescription pad this came from; correct?
A Yes, sir.
Q And whose name would this be here? You don't have to read the name. Whose name generally goes in this line?
A The name of the person on whose name the prescription is made.
Q And what about this line here?
A The full address of the person who the prescription is made.
Q And what about the date, "la fecha"?
A That's the day I wrote it.
Q This date on here, "fecha," is that the date you wrote the prescription?
A Yes, sir.
Q Okay. And this prescription is for what?
A Endocet 5, 325.
Q Now, what does the 5, 325 mean?
A This is five milligrams of the active ingredient which is Oxycodone, and 325 milligrams of acetaminophen.

Q So every Endocet pill has a total weight of 325 milligrams; correct?
MR. CASTRO-LANG: Objection. Leading, your Honor.
THE COURT: Rephrase. Rephrase.
MR. ANDERSON: Okay.
Q (By Mr. Anderson) What's the total weight of an Endocet pill?
A It would be at 330 milligrams total. Five milligrams of the active ingredient and 325 of acetaminophen.
Q And what is this number down here? This one says 715.9; what is that?
A This is a diagnosis code based on the ICD-9.
Q And do you know what that diagnostic code symbolizes?
A This is -- this code is for stone -- kidney stones.
Q And then on the bottom here -- on the bottom left-hand side, what are those numbers there?
A Well, the top number is the DEA number, the other number is the one for AMSCA (phonetic), and the last line is to repeat or not to repeat the prescription.
Q So these two numbers, the DEA and the AMSCA those are numbers assigned to whom?
A They were assigned to me.
Q And what's this over here on the bottom right-hand corner?
A This is my signature and the license -- physician license in the state of Puerto Rico.

Q And what is this -- Who puts this sticker on there; if you know?
A Well, the pharmacy.
Q Okay. And then one last question I forgot. Back up top. What is this number "50" refer to?
A The amount of pills to be dispatched of the medication.
THE COURT: Mr. Anderson, could you bring it up a little bit. I have a question for the Doctor.
MR. ANDERSON: Which would you like to see?
THE COURT: Up. Okay.
Doctor, where it's got the line for the repetition, is that an "X," or a four?
THE WITNESS: An "X."
THE COURT: Which means no repetition?
THE WITNESS: Controlled medication in Puerto Rico since about seven, eight years ago, you cannot repeat them.
THE COURT: Okay. Thank you.
Q (By Mr. Anderson) All right. So this is one prescription in Government's Exhibit 8-A; correct?
A Yes, sir.
Q And the rest of the prescriptions in 8-C, 8-B, 8-D through -M, they're all the same; correct?
A Yes, sir.
Q Were any of the prescriptions --
THE COURT: Wait a minute. Wait a minute. They're

-- they're the same, but some people -- some of the persons listed as the person who receives the prescription is different.

MR. ANDERSON: Yeah, I'm going to get to that.

THE COURT: Okay.

Q (By Mr. Anderson) The prescriptions we're talking about, all the same, meaning in 8-A through 8-M, all the prescriptions are for Endocet; is that correct?

A They're all for Endocet, yes, sir. Different names but the same medication.

Q And they're all written by you; correct?

A Yes, sir.

Q As the Judge pointed out, different names, though; correct?

A Yes, sir.

Q Were any of the prescriptions that have been entered into evidence, 8-A through 8-M, were any of those prescriptions written by you for legitimate medical purpose?

A No, sir.

Q And you charge -- As you said, you were charging $7 for every prescription; correct?

A Yes, sir.

Q Were these the only people for whom you wrote prescriptions that is contained in 8-A through 8-M?

A No, sir.

Q How about on Government's Exhibit 7-A through 7-D, the

patient list here provided by the Defendant, are there any other people you wrote prescriptions for that are not on these lists?
A Yes, sir.
Q And going back to your other testimony about the Defendant when he was a patient -- when he stopped being a patient and all that, when did you stop selling prescriptions to the Defendant?
A When I was arrested.
Q Do you know or remember when you were arrested; about?
A September 5th, 2007.
Q So based upon all your testimony here today, you've been selling prescriptions from -- to the Defendant since about 2005; correct?
A Yes, sir.
Q Okay. When did you first start selling prescriptions to anybody? Not necessarily the Defendant. In general, when did you go into the business of just selling prescriptions?
A At the end of 2004.
Q Do you have any idea as you sit here today how many prescriptions since the end of 2004 that you have sold for other than legitimate medical purposes?
A Well, I could figure out something between 9,000 to 11,000, but I cannot tell you an exact amount.
Q Do you have any idea the exact amount of people that you

sold prescriptions to?
A Yes, sir.
Q How many people have you sold prescriptions to?
A About 45, 50 persons.
MR. ANDERSON: Nothing further, your Honor.
THE COURT: Cross-Examination, Mr. Castro?
MR. CASTRO-LANG: Yes, your Honor.

**CROSS-EXAMINATION**

**BY MR. CASTRO-LANG:**
Q Dr. Senti, when did you begin cooperating with the prosecution?
A About four, five months ago.
Q And you had an attorney at the time you began cooperating?
A Yes, sir.
Q And prior to your becoming a cooperating witness, did the Government ever conduct interviews with you?
A My attorney, you mean?
Q No. No.
Prior to your signing a cooperation agreement with the Government, did you sit down with agents and prosecutors to be interviewed?
A Yes, sir.
Q Do you recall when your first interview occurred?
A No, sir, I don't recall the date.
Q Could you give an approximate time period?

A About a year, year and a half.
Q And at the time that -- that you began being interviewed, did they give you a letter to sign for preliminary agreement that you signed with your attorney?
A Yes, sir.
Q And you signed it also; right?
A Yes, sir.
Q And do you recall from the contents of that letter that it said that anything you said concerning your criminal history and your criminal activities, you would be given direct use immunity?
A No, sir.
Q You don't recall that?
A No, sir.
Q But you do recall signing a letter?
A I remember having signed a document whereby I committed myself to state the truth.
Q Among other matters; right?
A Yes.
Q And that was signed about a year and a half ago when you began this -- these interviews?
A Yes, sir.
Q Now, I ask you, how many times have you been interviewed by agents?
A Three times.

Q Are you sure, or is that an approximate amount?
A Well, approximately. Because a year and a half I remember I came on one occasion, then a long time went by, and then I came again.
Q But it could be more than three times?
A Yes, maybe one more.
Q Okay. Now, when you were interviewed by the agents, where was this interview conducted?
MR. ANDERSON: Objection. Which interview? He talked about three possibly --
THE COURT: Three or four interviews, which one are you talking about?
Q (By Mr. Castro-Lang) All of these interviews that you had with the agents, where were these interviews conducted?
A In this building.
Q Okay. And were there several agents present during the interview?
A Yes, sir.
Q About how many agents were present?
A Two, three.
Q Were they all from the same agency, or from different agencies?
A I don't know.
Q But there were always about two to three agents?
A (The witness moves head up and down.)

Q In addition to that, was a prosecutor present while these interviews occurred?
A No, sir.
Q And who would ask you questions?
A The agents.
Q And I ask you, while you were being asked questions, was another agent taking notes of what you were saying?
A Yes, sir.
Q So you would be asked a question, you would give an answer, and an agent would be writing down; is that correct?
A Well, it was not like a minute or anything like that, because not all answers were written down, but some of them they would.
Q So I take it that from your answer that you were able to review the -- what -- the notes that the agents took?
A No, but I would see the hand of the person writing.
Q But did you read what the agent was writing down?
A No, sir.
Q So you don't know exactly what he wrote down; right?
A No, sir.
Q Now, as you were being asked questions by the agents and they were taking notes, would they review with you what you had told them?
A No, sir.
Q Wouldn't they ask you questions to make sure that what you

were saying they had understood?
A Well, maybe could repeat the subject of the question, but not with the same question.
Q So they would review some matters with you; right?
A If they would review --
Q They could --
MR. ANDERSON: Objection. Can he answer the question.
THE COURT: Go ahead and ask the question.
Q (By Mr. Castro-Lang) They would review some matters with you; right?
A Yes, they would ask some of the questions they already asked, but in a different manner.
Q And if there had been some misunderstanding or something was incorrect, they would then correct?
A I don't know. I don't know whether they would correct it or not.
Q But certainly as the interviews were conducted, it was your feeling that they understood what you were saying; is that correct?
A Yes, sir.
Q Okay. Now, do you recall the different topics that these agents talked with you about during these interviews?
A Well, for instance, they would bring prescriptions for me to review, if they were mine; they showed me photos; they played some audio for me.

Q Would they ask you about your prior criminal history activity?
A Before this -- prior to this case?
Q All criminal activity that you had been involved in as part of your cooperation?
A And this one is the only one that I've been involved.
Q My question is: Did they ask you about your involvement in other criminal activity?
A I don't recall if they ever did.
Q And did they inquire with you when you started making prescriptions that were not medically necessary?
A Yes, sir.
Q And did they inquire for you to identify all of the different groups that you were supplying these prescriptions to?
A No, sir, I was only asked about the same group of persons that were arrested.
Q So you're telling this jury under oath that as part of your cooperation, you were never questioned about the identity of all of the people that you were involved with as part of the -- your providing medically unnecessary prescriptions?
A No, sir, only those involved in the group -- the group that I was arrested.
Q So I take it you failed to mention because you weren't asked other people that you gave prescriptions to?

MR. ANDERSON: Objection. Argumentative.
MR. CASTRO-LANG: It's not argumentative.
THE COURT: Sustained. Rephrase the question.
Q (By Mr. Castro-Lang) Did you provide additional names other than the people that were indicted with you concerning provision of medically unnecessary prescriptions?
MR. ANDERSON: Objection.
THE COURT: Overruled. Go ahead.
THE WITNESS: No, sir.
Q (By Mr. Castro-Lang) Were you asked about all of the different pharmacies where -- that were involved in changing medically unnecessary prescriptions?
A Yes, sir.
Q And did you mention how many pharmacies that you mentioned you had participated with?
A Basically on three pharmacies.
Q When you say "basically," do you mean there are more?
A There could be some prescriptions that had been purchased in another pharmacy; I wouldn't know.
Q Did you identify those pharmacies to the agents?
A They were all identified since we were arrested.
Q But there were three, and you just said that there could have been more involved.
A There could have been some prescriptions that maybe had ended up in other pharmacies. But basically all the

prescriptions were purchased in those three pharmacies.
Q Did you give names of additional pharmacies than the three that were accused with you?
A Well, the thing is I don't go with the patient to purchase. I don't know where he would go and buy it.
Q Uh-huh. Now, did they speak to you about your relationship with Reynaldo Landron?
MR. ANDERSON: Point of reference. Did who speak to him?
MR. CASTRO-LANG: The agents.
THE COURT: We're talking about the agents during the interview.
Q (By Mr. Castro-Lang) The agents that were interviewing, did they ask you specifically about Reynaldo Landron?
A In the last interview they already spoke directly about Reynaldo. In the others, it was about the people that got arrested.
Q So what you mean to say is that in your first interviews you never mentioned Reynaldo Landron-Class?
A Reynaldo was one of the persons that was arrested with us. What I mean is, we were mentioning all the persons being arrested since the first day.
Q So you did provide information upon questioning concerning Reynaldo Landron-Class during these interviews?
A Yes, as well as to all the other co-defendants.

Q And you provided information about all these other people that you were also involved with?
A Yes. As to the co-defendant, yes. Then he asked me about the other persons.
Q But you mentioned that you had about -- that you dealt with 35 to 45 people.
A Uh-huh.
Q Didn't you talk about the 35, 45 people that you had given these medically unnecessary prescriptions to?
MR. ANDERSON: Your Honor, this has been asked and answered several times.
MR. CASTRO-LANG: He hasn't.
THE COURT: Don't argue. Don't argue among yourselves. Overruled. Go ahead and answer.
THE WITNESS: As to the 23 who were arrested along with me, only.
Q (By Mr. Castro-Lang) So you didn't speak about the remaining up to the 45 others; right?
A No, sir.
Q So there are people that you are involved with that you failed to talk about with the agents; right?
A Yes, sir.
Q Let me ask you, did they question you also about the different lists of patients that you had?
A Yes, sir.

Q And did they ask you where those lists were located?
A The day of the arrest, they seized them from my house.
Q But did they ask you if there were more in other places?
A Yes, they did ask.
Q Okay. Now, okay, did they talk to you about your cheating on your income tax returns?
A No, sir.
Q They never confronted you with your false income tax returns?
A No, sir.
Q They never asked you where you got the money to purchase all the properties that you have?
A No, they did not ask me.
Q They never asked you --
A All they did was they seized them.
Q They never asked you about the properties that you put in other people's names to hide that they were yours?
A They were all under my name.
Q So you never put properties in other family members' names?
A Well, for instance, there was one, the one where my mother was living before she died, that was under her name and mine. There was another one that was under the name of my mate and mine. And there was another one that I had given away as a gift to my nephew who was getting married, and it was under both our names.

Q So you never told the agents that you had put properties in the name of your daughter and sisters to keep them from being attached in a civil suit?
A I don't have any property -- I don't have any property under my sister's name or under my -- any of my children. By the way, I don't have any children.
Q Are you married?
A No, sir.
Q Okay. Now, did they ask you if you had additional properties in those identified in the Indictment?
A Yes, sir.
Q Did they ask you what you had done with all the money that you had earned through all these years of giving these medically unnecessary prescriptions?
A No, they did not ask me. What I did was to pay debts.
Q Uh-huh. What, you told them you didn't have any money?
A No, I don't have any.
Q Now -- so all of these matters that you answered to were matters that the agents were taking notes of while you were being interviewed; is that correct?
A Yes, sir.
MR. CASTRO-LANG: Your Honor, may we approach?
THE COURT: Of course.
(Side-bar.)
MR. CASTRO-LANG: Your Honor.

THE COURT: Yes, sir.
MR. CASTRO-LANG: At this time, your Honor, we inform the Court that we are not ready to continue cross-examining this witness. This witness has just admitted to a substantial amount of information that is relevant to Cross-Examination, that could include impeachment evidence, that could definitely include statements that could be subject to extrinsic evidence for impeachment under Rule 613(b). Obviously, without my having the Reports of Investigation, I cannot confront him with them to see if he adopts them or to see if -- if in fact they contain substantially verbatim account of what he gave. Even if they were -- could be some admissions, as you know, under Rule 613(b), if there's a particular statement of an admission made, once I have the document, and I have what was said by the agent, I can confront him to see if he gave a statement or not, if he denies it, then pursuant to Rule 613(b), then subpoena the agent to impeach him.
I don't know the contents of the ROIs, but I do know from the general testimony that's on the record, I have no doubt that I have potential Jencks, potential Brady, potential Giglio, and go further, perjury. I have been present, your Honor, in many cooperating witnesses interviews. I know what occurs; I know what rule letter provides, which is not been provided to me by the Government and should have been provided because it does contain an immunity promise, which is Giglio.

And I know that agents go through your whole criminal history. This testimony here in court, I have profound valid reasons to believe is perjury. I have no doubt that any agent that interviews a potential cooperator will go and try to identify all of the people that were involved with that person regard -- In fact, they're even interested in not only the ones that have been indicted, but those that haven't been indicted. And so this testimony here in court is replete with assertions that, quite frankly, give me a basis to believe he has perjured himself here today. And there's no way -- there is no way -- In fact, your Honor, I'm -- the problem is even more complicated because I've been taken totally by surprise by this witness' direct testimony. If I had been provided the ROIs when I requested -- when the Court ordered not, that I requested them. -- and I don't know if the ROIs have what he says here in court, your Honor. But if I had read in an ROI what he just said here in court under oath, I would have had transcripts of recordings translated to impeach him. It's impossible with me -- for me what the Government gave me, which was a Plea Agreement, to have a magic ball and guess what lies he would come forth with, what statements that I will -- in my experience, know are intentional falsehoods.

I -- I want all the ROIs, your Honor. I believe that -- In fact, your Honor, Gonzalez-Melendez clearly puts at a minimum an obligation of the Court to examine it. But

the -- There's a problem, your Honor, with -- with your Honor examining it and making a determination. And I'll tell you why. There are over 3,000 calls that you've never heard. Okay? There are boxes of discovery that you don't know about. You could hear something, because you don't know the case, you won't recognize that it's impeachment evidence. I would. I would. I'm in the best position to analyze those ROIs, be able to identify evidence under Rule 613(b), that I could then confront the witness with. If I don't have the ROI, your Honor, it's impossible for me to comply.

THE COURT: Would you agree with me that you can -- you have access to -- have access to ROI --

MR. CASTRO-LANG: I don't.

THE COURT: Wait a minute. Let me ask the question.

-- that the only way you have access to the ROI is if he has adopted them?

MR. CASTRO-LANG: No. No.

THE COURT: Yes, that's the way it is. That's the way it is. You know it.

MR. CASTRO-LANG: No it's not.

THE COURT: I'm speaking. Don't interrupt.

From his testimony it's absolutely clear to me -- absolutely clear -- that he didn't adopt any of the agent's notes or the ROIs.

MR. CASTRO-LANG: He can adopt them on

Cross-Examination because he doesn't know -- I'm sorry, your Honor, he does not know what's in the ROI, for number one, unless he -- he can adopt them --

THE COURT: Mr. Castro --

MR. CASTRO-LANG: To see if it's substantially verbatim.

THE COURT: No.

MR. CASTRO-LANG: And again -- Wait. An ROI can contain impeachment evidence. It goes way beyond Jencks, and I am not -- it's impossible for me to effectively cross-examine this witness without the Reports of Investigation. There are multiple facets here that go way beyond just mere Jencks, potential Brady, potential 613(b), and --

THE COURT: I don't think 613(b) even applies.

MR. CASTRO-LANG: The Court is depriving me of my ability to cross-examine the main witness in this case, your Honor.

THE COURT: No. Your request is denied.

MR. CASTRO-LANG: Well, I have more. I have more problems here.

THE COURT: You've been repeating yourself.

MR. CASTRO-LANG: Well, I have another situation. I have -- have heard for the first time his version of events. For the first time, I have heard his version of events. After hearing his version of events, there are -- there are

recordings that now I realize I will have to -- for the first time --

I can't guess what a witness is going to say. I'm in shock that some of the statements he has said. Now I have to translate and pick out recordings that I need to use to impeach this witness that it was impossible for me to identify before because the only thing --

THE COURT: I'm not buying that, Mr. Castro. I'm not buying that at all.

MR. CASTRO-LANG: You're not buying that?

MR. ANDERSON: And the defense counsel this morning in court had his computer up, and he was playing calls on his computer. So he knew when he came in today certain calls he could have possibly used to impeach --

THE COURT: I'm not going to -- Mr. Castro, first of all, like I said before it's absolutely clear he did not adopt any of the agent's statements. Second, I'm not going to act based on the generalities that you just stated. So your request is denied.

MR. CASTRO-LANG: Well, let me finish. I have authority that you are not proceeding in accordance with Felix Gonzalez-Melendez. You are not proceeding with -- It's my case where -- the case was remanded on appeal. 507 F.3d 1. The Court remanded and said that you have an obligation to examine the ROIs before denying my request. You have not examined the

ROIs; and pursuant to Felix Gonzalez-Melendez, I request that you order the Government to produce all ROIs to you for your *in camera* examination for you to determine if they have the impeachment value and that I am entitled to receive or that somehow they --

THE COURT: Wait a minute. Wait a minute.

MR. CASTRO-LANG: That's what the case says.

THE COURT: They may be the general ruling.

MR. CASTRO-LANG: That's recent. It was reversed and remanded.

THE COURT: Hold on.

(Document is handed to the Judge.)

(Respite.)

THE COURT: All right. Let me ask Mr. Anderson. Are the ROIs recorded -- made by the witness reported contemporaneously with the making of the statement, or written later?

MR. ANDERSON: No. Written later.

MR. CASTRO-LANG: But they were taking notes contemporaneously.

THE COURT: They did. But the ROI isn't. Your request is denied.

MR. ANDERSON: I don't think we're going to finish with the witness today. Correct?

MR. CASTRO-LANG: Your Honor --

MR. ANDERSON: Because to -- to address the issue, I have the ROIs prepared, unredacted and redacted, as to what his testimony. I can give your Honor. Overnight you can look at them and give an answer tomorrow, to be on the safe side. I had anticipated this argument. I have them ready. I can give them to the Court for *in camera* inspection.

THE COURT: All right.

MR. CASTRO-LANG: No, your Honor. Again, I can read all the lines, call lines, telephone conversations, it's impossible to know everything what the witness has said, and, again, by not having the ROIs, I was taken by surprise from the witness' testimony.

THE COURT: It's -- Mr. Castro, it's a question of reading the ROIs to see if there's statements under Jencks. That's it.

MR. CASTRO-LANG: Just so you're understanding what I'm trying to ask you. Because I've heard his story just now; I feel that I need additional time to polish my Cross-Examination and add areas of Cross-Examination that, quite frankly, is impossible for me to know what this witness was going to testify about.

THE COURT: Look, Mr. Castro, wait a minute.

MR. CASTRO-LANG: I have to -- I have to make a record.

THE COURT: Well, wait a minute.

MR. CASTRO-LANG: I have to make a record.
THE COURT: Wait a minute. Don't interrupt me, Mr. Castro.
MR. CASTRO-LANG: I'm not.
THE COURT: Don't interrupt me.
From what I've heard, this witness, I could follow his testimony completely just by knowing generally what the case is about. You've had this case for --
MR. ANDERSON: Two and a half years.
THE COURT: -- almost three years. If you can't -- if you have to do that now, I -- I don't know, I really feel sorry for you.
MR. CASTRO-LANG: You can feel sorry for me. There are new matters that this witness testified that I need to get the documentation to cross-examine him about. Matters that I had no idea he was going to testify about.
THE COURT: Well, I just can't believe that, Mr. Castro with an --
MR. CASTRO-LANG: Maybe not as smart as you.
THE COURT: -- a lawyer of your experience, I just find that very hard to believe.
MR. CASTRO-LANG: I'm not as smart as you are. I apologize. I wish I were.
THE COURT: That may be true or -- That may be true, but you have much more experience than I do on these matters.

All right, sir. Let's move along.

MR. CASTRO-LANG: Under Selpulveda, I ask for a continuance until tomorrow at 2:00 so that I can come early in the morning, read the transcript of Mr. Vazquez-Senti's testimony, the Court will have had sufficient time to examine the ROIs that were given by the prosecutor; and that way, I will have a little bit more time to add those matters that, quite frankly, have taken me completely by surprise.

THE COURT: I doubt that very much. But what we're going to do, I've got to review the ROIs this evening, but we'll start tomorrow at 9:00.

(End of side-bar.)

THE COURT: All right. Ladies and gentlemen of the jury, I have some legal matters that I have to attend to, so I'm going to let you go for the day. Please be back tomorrow at nine o'clock. Remember what I told you, don't talk about this case with anyone, not even among yourselves, until you go back to the jury room to deliberate, okay? We'll see you tomorrow at nine o'clock.

COURT SECURITY OFFICER: All rise.

(The jury is escorted from the courtroom at 3:42 p.m.)

THE COURT: All right. Please be seated. Mr. Anderson, you have those documents copies?

MR. ANDERSON: Yes, your Honor. And also I would like, if your Honor can issue an Order -- Well, I guess it's

the way to do it. -- ordering the Marshals to return the witness tomorrow. Because we -- we took him out of MDC today because it's a Wednesday, but I think at this point -- since he's a witness in trial, I believe your Honor can order his return by the Marshals by tomorrow. Am I correct?

THE COURT: Well, the Marshals are here so they know that the witness has not completed his testimony, and we need him back tomorrow to start at nine o'clock.

U.S. MARSHALL: Yes, your Honor.

THE COURT: Thank you.

MR. ANDERSON: And for the record, your Honor, pursuant to the side-bar, I'm going to pass up to your Honor ROIs from December 13th, 2007; February 12th, 2008; and September 28th, 2009. These are Reports of Investigation of interviews of the witness. I'm giving your Honor an unredacted, and behind is the redacted copy which closely follows his testimony in Cross-Examination.

THE COURT: All right. Thank you.

(Documents are handed to the Court.)

THE COURT: All right. Mr. Castro, would you please give me the cite of the case that we were talking about.

MR. CASTRO-LANG: Yes, your Honor. It's United States versus Felix Gonzalez-Melendez, 570 F.3d 1, 2009, First Circuit.

THE COURT: Thank you very much. See you tomorrow at

nine o'clock.

MR. ANDERSON: Thank you, your Honor.

(The hearing of this cause adjourned for the day at 3:44 p.m., on June 2, 2010.)

**R E P O R T E R' S   C E R T I F I C A T E**

**UNITED STATES DISTRICT COURT )**
**) ss.**
**OF PUERTO RICO )**

I, **ROLAYNE M. VOLPE**, Certified Court Reporter, CCR, and Registered Professional Reporter, RPR, do hereby certify that the transcript of the foregoing proceedings accurately reflects the events that occurred before me to the best of my ability at the time and place set out on the caption hereto, the witnesses having been duly cautioned and sworn, or affirmed, to tell the truth, the whole truth, and nothing but the truth.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were taken or to any attorney or counsel employed by the parties hereto, nor financially interested, directly or indirectly, in the outcome of this action.

CERTIFIED AND SIGNED on this 2nd day of June, 2010.

S/: Rolayne M. Volpe
ROLAYNE M. VOLPE, CCR, RPR
Certified Court Reporter and
Registered Professional Reporter